[No. 765.]

# EUREKA MINING AND SMELTING COMPANY, Appellant, v. FRANK WAY, Respondent.

Actual Possession of Land.—A perfect inclosure of timber land is not necessary. If there be an occupation within boundaries so clearly marked and defined as to notify strangers that the land is taken up or located, it is all the possession that is required.

Idem.—The acts necessary to constitute possession, must, in a great measure, depend upon the character of the land, the locality, and the object for which it is taken up.

Idem.—Where the plaintiff relies solely upon possession there must be an actual and continuous occupation of the land, within such boundaries, a subjection of the land to the will and control of the claimant.

Idem—Natural Boundaries.—Bluffs of rock, and summits of a mountain, may be so steep and rugged as to constitute a natural boundary of land. The question as to what constitutes natural boundaries discussed in the opinion.

Idem.—The facts of this case discussed, and the acts of possession by appellant held insufficient to maintain the action. (Beatty, J., dissenting.)

Idem.—Natural boundaries, when taken in connection with artificial, are sufficient to make the boundaries of timber land; but the artificial boundaries must be made in such a manner as to clearly mark and define the lines, and must connect with the natural boundaries in such a manner that any person going upon the land could, by following the marked lines, tell the precise extent of the land located and claimed, and the claimant must be an actual occupant within such boundaries.

APPEAL from the District Court, Sixth Judicial District, Eureka County.

The following are the outlines of the map referred to in the opinion:

The facts are sufficiently stated in the opinion of the Court.

*Hillhouse & Davenport*, for Appellant.

I. The question involved in this appeal is: Was there sufficient testimony on the question of possession by plaintiff, or its grantors, to submit to the jury ?

The object of the inclosure of timber land is to notify sub-

sequent comers that the land is claimed—is located, and that it is being used for some beneficial purpose. If that object is fully obtained by other than building brush-fences or blazing trees, the intent of the law is satisfied.    The summit of the mountain—the rocky bluffs or points with which the fences connect,—the fact that wood and timber cannot be taken off at those parts of the tract, taken together with the brush-fences on the east side, and along portions of the north and south ends, render it perfectly clear what was claimed by plaintiff.    That no wood or timber could be taken from that tract, without crossing those brush-fences, of itself, would notify any subsequent comer.    But in addition to this, most of the timber on this tract lays up in three cañons, with steep sides, across the mouth of each of which, in addition to the brush-fence, were placed bars and ditches, which, to use the language of witnesses, inclosed that land as effectually as would a fence across the neck of a peninsula inclose it.

II. If the claimants, although they had no fences, yet exercised dominion and control over the land, and subjected it to their power, the matter of fences become immaterial and unimportant.    It is well settled that actual possession of land may be had without fences or inclosures. (*Ware* v. *Scott*, 2 Dana Kent R., p. 275; *Ellicott* v. *Pearle*, 10 Pet. 442; *Ewing* v. *Burnett*, 11 Id. 41–9; *Hicks* v. *Coleman*, 25 Cal. 132; 17 Id. 463; *Bene* v. *Gratz*, 5 Wheat. 222; *Wolfskill* v. *Malajorich*, 39 Cal. 276; 45 Id. 496; *Rogers* v. *Cooney*, 7 Nev. 219; *McCreery* v. *Everding*, 44 Cal.)

III. If in the whole transcript there is any evidence that would support a judgment, in plaintiff's favor, a nonsuit should not have been granted. (*Sharon* v. *Davidson*, 4 Nev. 416.)

*Thomas Wren and D. E. Bailey*, for Respondent.

The principal questions involved in the discussion of this case relate to the kind of possession of the public timber lands in this state a party must have to entitle him to maintain an action of trespass for cutting timber thereon, and these questions are settled by the authorities: *Sankey* v.

*Noyes*, 1 Nev. 68; *McFarland* v. *Culbertson*, 2 Nev. 280; *Eureka M. & S. Co.* v. *Way*, 9 Nev. 350.

If the land upon which it is alleged the trespasses were committed by defendant had not been marked by "metes and bounds, so that the boundaries could be readily traced and the extent of the claim easily known," at the time the alleged trespasses were committed, the judgment of nonsuit should be affirmed. It was not urged upon the trial of this case that natural boundaries were not as effectual for all purposes as artificial boundaries. Neither did the court so decide or intimate upon granting a nonsuit. On the contrary the case was tried upon the theory from first to last, that natural, taken in connection with artificial, boundaries were sufficient in law to mark the boundaries of timber land. What the court did decide, was, that plaintiff did not show that the boundaries of the land in dispute were ever sufficiently marked by either natural or artificial means. The boundaries were not so marked that they could be easily traced and the extent of the claim readily known.

By the Court, HAWLEY, C. J.:

This is an action to recover damages for an alleged trespass in cutting and carrying away wood and timber from a tract of six hundred and forty acres of land claimed by appellant.

The real question presented by this appeal, which is taken from an order of the court granting a nonsuit, is whether or not there was sufficient evidence as to the possession of the land by appellant and its grantors to authorize the court to submit the case to the jury.

The land is situate on the eastern side, or slope, of a mountain, and is valuable only for the wood and timber thereon. The ranch is cut up by ravines and cañons, which in many places are very precipitous, and it is described as a "rough, rugged, rocky piece of ground," over which "timber grows in bunches." There is a well-defined brush fence along the east line or boundary, and a similar fence on the north and south lines, from the east line about half way toward the summit of the mountain, which is claimed

as the western boundary. The fence on the north and south lines stops at a bluff of rocks which run in a northerly and southerly direction. From the bluff of rocks to the summit the lines are claimed to be designated by blazed trees.

Without here entering into the details of the testimony, it may be stated, in general terms, that for more than one-quarter of a mile on the south line between the bluff of rocks and the summit of the mountain there are no blazed trees to designate the boundary, and for a distance of twelve hundred and sixty feet from the southwest corner along the western line, over a smooth, grassy plot, to adopt the language of the witness Jenkins, "there is no monument, tree, or anything else to mark the line."

Under the decisions of the supreme court of this state, a perfect inclosure of timber land is not necessary. "If there be an occupation within boundaries so clearly marked and defined as to notify strangers that the land is taken up or located, it is all the possession which the courts of this state have ever deemed necessary to require." (*McFarland* v. *Culbertson*, 2 Nev. 282.) This principle was announced in a case, where, to quote from the opinion, it was clearly shown by the testimony introduced by the plaintiff that the fence, which consisted of felled trees, brush, and stone, was continuous and unbroken around the entire claim, except upon one side, where there was an opening of some few yards, but upon that side it joined a tract which was completely inclosed with the same character of fence." The court, upon this testimony, said it was established beyond question that the fence distinctly marked the boundaries of the plaintiff's claim, and held that: "That character of inclosure, together with the continuous occupation by the plaintiff, certainly constituted such a possession as would entitle him to recover in ejectment against any subsequent locator who had no title from the government."

Under this liberal rule, the acts necessary to constitute possession, "must in a great measure depend upon the character of the land, the locality, and the object for which it is taken up." (*Sankey* v. *Noyes*, 1 Nev. 71.) In every case where the plaintiff, as in this case, relies solely upon

possession, an actual and continuous occupation of the land, within such boundaries, must be shown. There must be a subjection of the land to the will and control of the claimant. This principle is announced in both of the cases above cited, discussed at length in *Staininger* v. *Andrews*, 4 Nev. 66; *Robinson* v. *The Imperial Silver Mining Company*, 5 Nev. 66; and adhered to in *Kraft* v. *Carlow*, 9 Nev. 21.

It is evident that the material facts elicited at the trial fell far short of meeting the requirements of these decisions. In the absence of a perfect inclosure, it is certainly essential that the boundary lines should be so clearly marked and defined that the same could be readily traced, and the extent of the claim easily known, and no stretch of imagination could be so extended as to authorize any court to hold that the boundary lines were so marked and defined around the land in question. How could a stranger crossing over the smooth, grassy spot designate the boundary? There is no fence, no string of brush, or felled trees, no mark or monument for a distance of one quarter of a mile. Almost the same condition of the boundary is found on the south line between the bluff of rocks and the southwest corner. A stranger in entering would discover no visible signs of any designation of boundaries whatever. The law does not require any speculation upon these points. The acts necessary to clearly mark the boundaries must be done in order to notify strangers that the land is located, otherwise any person would have as much right as the claimant to enter upon the land, cut the wood and timber thereon, and take the same away. In such a case, both would be trespassers upon the public land.

The necessity of adhering to the rule which requires the boundaries to be clearly marked and defined becomes apparent upon an examination of the evidence in this case. It is claimed by appellant that the summit of the mountain constitutes a natural boundary, and that it was unnecessary to mark or define the west line. G. Collier Robbins, who for several years claimed to have the control of the land, and who rode on horseback, without much difficulty, over and along the summit to see about the west line, says: ''I

found it so rocky and precipitous about the head of the cañons, that I thought I would do nothing about that line. * * * There was no fence put along the west line (or), on the south of the west line, because it was so steep that there appeared to be no necessity for a fence. * * * There is a large grassy plot near the southwest corner. There is very little timber on the bald mountain. I considered the bald mountain and the grassy spot and bluff along the west line a natural boundary, and for that reason I did not have anything done with the line. I considered the summit a plain natural boundary. There is a bluff of rocks on the north line which forms a natural boundary. Taking that bald mountain, the summit, those bluffs and fences, and no man could go upon that ranch and not know what was claimed." This testimony clearly states appellant's case, and the last sentence quoted indicates the theory upon which appellant relies.

It is contended that the only object of an inclosure is to notify subsequent comers that the land is located and claimed and is being used for some beneficial purpose, and if that object can be fully obtained by any other means than building fences, or blazing trees, the intent of the law is satisfied. This argument is specious. A moment's thought will expose its fallacy. If adopted, all that the claimant would have to do in order to accomplish the object would be to employ a sentinel to remain upon the land and notify every man who attempted to enter that it was located and claimed, and to point out the boundary lines. No one will pretend that this would be a compliance with the law. Even appellant admits the fact that the lines must in some manner be designated by visible boundaries, and to sustain its theory we find "bluff of rocks," "bald mountains," "summits," "skirts of timber," "slopes of the hill," and "hillsides," interjected from the lips of witnesses, to fill up the gaps unmarked on the pretended boundaries of the land. That bluffs of rocks may form a natural boundary is undoubtedly correct. The law does not require a vain and useless thing to be done, and there would be no sense in a law which required the erection of a fence over a bluff of

rocks so steep and rugged that neither man nor beast could travel over it. *Lex non cogit ad impossibilia.* The same might be true of the summit of a mountain. But the map which accompanies the transcript, and which is referred to in the evidence, shows the extent of the bluff of rocks which are found on the north and south lines. If the brush fence had been continued on the west side of the bluffs of rocks these boundaries would have been properly defined, but the bluff of rocks, as before stated, extends in a northerly and southerly direction, and do not follow the line claimed as the boundary. A stranger, then, following the brush fence to ascertain the lines, finding that it stopped on the east side of the bluff, would naturally suppose that the bluff of rocks was intended for the western boundary instead of, as claimed, being a part of the north and south lines. This, by an examination of the map, is made too clear for argument. This may have been the belief of the respondent, for it appears that he did not enter upon, or cut any wood or timber, or claim any portion of the land on the east side of the bluff of rocks where the brush fence terminates.

Appellant is equally unfortunate in its attempts to define the western line. Samuel Watson, who assisted in building the fence and blazing trees, defines what he considers a natural boundary, as follows: "If I was allowed to answer as I want to I would say the summit forms a natural boundary." From his subsequent testimony it clearly appears that he was allowed to answer as he wanted to, and we have his full definition clearly given. "The proper meaning of the summit, to come right down to it, would be to come up near to the summit; we did not pretend to go in a straight line. * * * What I understand by a natural boundary is such that a man could not haul wood across with a profit." This definition of a natural boundary is unique. It certainly cannot be found in any dictionary, nor sanctioned, we apprehend, by any decided case. If adopted, how would a stranger ever be notified that any tract of land was located or claimed? Whenever he sees a brush fence on one line, he need not look for any marks, stakes, monuments, blazed trees, or fences, to designate any other

line; but must first ascertain whether any wood or timber could be hauled off the land with a team without crossing the brush fence; and if this is ascertained in the affirmative, he must next determine by an arithmetical calculation whether it could be so hauled off with a profit, and at whatever point this could not be done, whether it be on the summit of a mountain, slope of the hill, smooth, grassy spot or level plain, there is the natural boundary beyond which he dare not enter without fear of being mulcted in damages. It would indeed be a difficult task to define the limits of the land claimed within such boundaries. Litigation would be endless; for the question whether wood could be hauled from any given point over certain boundaries, would, among other things, be dependent upon the means, energy and economy that might be employed by different persons. This, however, is the imaginary line designated as a natural boundary, which could be readily traced by a stranger. It is absolutely necessary for appellant to insist upon the correctness of this position in order to maintain this action. Nearly every witness examined by appellant testified that some wood and timber might be hauled over the lines without crossing any of the fences built by appellant or its grantors. Watson says: "Up near the summit, where Way took up the land, you could, by taking the timber and wood up the hill a little, * * get a little off; but further down I think it would be an impossibility." How much further down? Where is the line? How determine this imaginary boundary up to which the right to cut wood exists, but to cross beyond which would constitute a trespass. The same witness says: "At the line along the southwest corner I think you could get considerable wood by taking it into the Secret Cañon road." And McKenzie testifies that: "Timber might be taken off at northwest and southwest, and west and north sides of the ranch between the bluff of rocks, at which the brush fence terminates on the south line, and the next bluff west or southwest from it. The ground is perfectly smooth; * * could build a road out between these bluffs and take out a great deal of timber."

Each witness has a different theory by which the boundary lines could be designated. One thought the skirt of timber high up near the summit constituted the west line, it being shown that the line of timber gives out near the summit; in some places coming within three hundred feet, and at others being three hundred yards from the summit. Alfred Perkins, after stating that "the fences and mountains and precipitous rocks" would cause him to believe that "the wood was taken up and located," says: "the hillside and mountain-top make a natural boundary." If he had confined himself to the mountain-top his meaning would be clear, but when he includes the hillside he takes in the whole ranch. As we proceed, the boundary becomes more visionary. John Horn testifies: "From the formation of the country, and the fences * * * I should consider the west line the best defined line on the ranch." Why? "Because "I have been along the mouths of the cañons and I can see no way that timber could be taken from those cañons without crossing out at the mouths of the cañons." He next declares that: "The lines can be readily traced and the extent of the ranch easily known from the fences and natural boundaries;" although he was never on or near the west line. The declaration is based entirely upon his general observations and his own peculiar ideas of a natural boundary. "I never was on the western line of the ranch, I saw it from the eastern side of the ranch. Was never along the lines of the ranch." And yet he testified that the lines could be readily traced. How? He explains it in this manner: "I call that western line a natural boundary. The eastern slope of that mountain forms the boundary." Now we have seen that the whole ranch is on "the eastern slope of that mountain," and if we adopt the views of this witness the entire ranch becomes a natural boundary which can readily be traced. But he is still more explicit. "There is no way by which timber can be hauled from off that ranch, by the means ordinarily used in this country to haul timber, without crossing some of the brush fences on the ranch." In another portion of his testimony he says: "there is nothing marking the line on the west side except the hillside," and

in further explanation of the line on the summit and eastern slope of the mountain, says: "I look at it as a natural boundary because you cannot cross it with a team." If this latter definition of a natural boundary is correct, then what becomes of the grassy spot over which, according to the testimony of the witness, Robbins, "a sixteen-mule team could be driven." To designate that part of the line, this witness corroborates the statement of the witness, Watson, and says: "Timber could not be got off this ranch, *to pay*, without crossing some of the fences."

This is the general outline of the testimony, from which it appears that the west line is marked and defined by the different theories of witnesses, adopted at various points as the emergency of any given locality may require. To illustrate: the summit of the mountain, slope of the hill, and skirt of timber on the western line, for three quarters of a mile, is a natural boundary because you cannot drive teams over it. The smooth, grassy spot on the same line, for the other quarter of a mile, is a natural boundary because you cannot haul wood or timber over it with a profit. The same may be said of the west half of the north and south lines. But the unsoundness of the position contended for by appellant is still further demonstrable. In many places the wood on the ranch has to be cut on the hillsides and sledded down into the cañons. It appears from the testimony that it is a common practice to pack wood from the mountains with mules and donkeys, and that this could readily be done without crossing any of the fences or roads erected by appellant, its grantors or predecessors in interest. We know of no rule that would compel a man to haul wood with a team when he could make it more profitable by employing other agencies. It is useless to comment further upon the testimony. Objections to its sufficiency could be multiplied and extended without limit, *ad libitum*. The fact is everywhere patent that the lines cannot be readily traced, nor the extent of appellant's claim easily known, from any natural or artificial boundaries. The theory upon which appellant bases its claim cannot be sustained upon reason or authority. The question whether wood or timber could be

hauled off from any portion of the land, with or without a profit, without crossing some of the roads or fences built by appellant's grantors, was wholly immaterial, and ought not to have been admitted. In what manner were the boundary lines marked and defined? This was the material question to which the testimony should have been directed. That natural boundaries, when taken in connection with artificial, are sufficient to mark the boundaries of timber land, will not be disputed; but the artificial boundaries must be made in such a manner as to clearly mark and define the line, and must connect with the natural boundaries in such a way that any person going upon the land could by following the marked lines tell the precise extent of the land located and claimed, and the claimant must be an actual occupant within such boundaries. Numerous authorities are cited by appellant to the effect that actual possession of land may be had without fences or inclosures; that the claimant's dominion and control over the land may be shown by proof that he lives upon it, cultivates a portion of it, &c. &c. This rule is correct when applied to the facts of the cases cited. But it has no application whatever to the facts of this case. Where the land is held in private ownership, and a party enters in good faith, under a deed calling for specific boundaries, the entry is in harmony with his claim of title, and "sound reasons of justice and public policy demand that his possession should be deemed to be co-extensive with the calls in his deed, provided that no other person be in the actual possession. But the reason for the rule wholly ceases when the grantee, at the time he took the conveyance, knew the land granted to be a part of the public domain, and that the deed was wholly inoperative to convey any title, whether legal or equitable. (*Wolfskill* v. *Malajovich*, 39 Cal. 281.)

Where a party enters upon land knowing the same to be a part of the public domain he is only entitled to recover as against a trespasser having no title, upon showing such facts as will be sufficient to raise a presumption of title in himself, and in cases like the one under consideration the presumption of title extends only to the actual possession,

the *possessio pedis*, and whenever the plaintiff fails to show such possession he fails to make out a case.

The judgment of the district court is affirmed.

Beatty, J., dissenting:

I think that, in this case, there was testimony sufficient to entitle the plaintiff to the finding of a jury on the question of possession, and therefore I dissent from the opinion of the court. There was ample proof that the plaintiff and its grantors had been in the notorious occupany of a portion of the tract claimed a long time before the defendant entered. They had built roads and cabins and felled trees. The only question was, whether the boundary of their claim was sufficiently defined to be readily recognized and traced. I quite agree with the court that upon this point the case made by the plaintiff was a weak one, and particularly that its theory of a natural boundary on the west, and on portions of the north and south lines is untenable. But there were one or two witnesses whose testimony as to the artificial boundaries was sufficient in my opinion to make out a *prima facie* case. Putting the most favorable construction on their testimony and taking it for true, it proved that the east line was marked by a continuous fence, the north line by a fence half the distance and by blazed trees for the balance. From the northwest corner the west line was marked nearly three-fourths of its length by blazed trees, and from the southeast corner the south line was marked half way by a fence and for the rest by a few blazed trees near the southwest corner. There was something over a quarter of a mile of the south line, and a little less than a quarter of a mile on the west line, not marked in any way, but it was the opinion of several of the witnesses that no man could have gone upon the ground and failed to see what land was claimed. It is true they differed among themselves as to the exact boundaries, and a jury might readily have differed from them all, but I think nevertheless, the question should have been submitted to the jury. The language of this court in the case of *Sharon* v. *Davidson*, 4 Nev. 419, seems to be exactly in point: "There was

evidence tending to prove a survey, a marking of lines by blazing and felling trees, building a mill and other houses, cutting timber and wood and other acts of appropriate dominion. Whether this was sufficient to establish plaintiff's claim was for the jury, not the court, to decide."

I think the judgment should be reversed.