[No. 882.]

FRANK RIVERS, RESPONDENT, *v.* S. M. AND C. E. BURBANK, APPELLANTS.

INJUNCTION—WHEN SHOULD NOT BE ISSUED. — An injunction should not be issued to enjoin a defendant from doing, upon the public domain, what the paramount law declares he may do (dig a ditch) when he is not insolvent or unable to pay all damages that may be done. (*Thorne* v. *Sweeney,* 12 Nev. 254, affirmed.)

POSSESSION OF LANDS, SURVEYS WHEN RECORDED.—BURDEN OF PROOF.— In construing the act to regulate surveyors and surveying, (Stat. 1861. 267; Stat. 1864-5, 344): *Held,* that the surveys of land to be evidence

of possession must be filed for record within the time provided by statute, and that the burden of proof was upon the plaintiff to show that they were so recorded.

IDEM—CUSTOM AS TO POSSESSORY TITLE NOT ADMISSIBLE.—Instructions informing the jury that they might consider any well known or recognized customs among the farmers as to the manner of claiming and holding land by possessory title: *Held*, inadmissible.

ACTUAL POSSESSION—DEED TO ENTIRE TRACT.— The rule, that actual possession of land may be had without fences or inclosures; by proving that a party lives upon and cultivates a portion of it and holds a deed to the whole tract, does not apply to a case where a party enters upon the land knowing it to be a part of the public domain, and that his deed was inoperative to convey any title. (*Eureka M. & S. Co.* v. *Way*, 11 Nev. 171, affirmed).

IDEM—WANT OF DILIGENCE.—Where the plaintiff testified that he inclosed the land as rapidly as he was able; but failed to show any act or effort of his in this behalf for a period of two years: *Held*, upon a review of all the facts, that plaintiff failed to show that he proceeded with reasonable diligence to subject the land to his dominion or control.

IDEM—MARKING OF BOUNDARIES. —The land claimed was agricultural or grazing land; it had been used as a common for grazing purposes without objection; there was no inclosure of any portion of the land upon which the ditch of defendants was dug; on one side of the land posts, two rods apart had been set; on another side post-holes were dug the entire distance, posts were set a part of the way and scattered upon the ground on the remaining part, for long distances the post-holes were filled up and there were few if any signs of a marked boundary. At one place there was a distance of forty rods with no boundary line except a ditch belonging to defendants, while the next forty rods had no boundary but a public road. In the whole eighty rods there was not a post-hole, post, or fence of any character: *Held*, that this testimony was wholly insufficient to create any possessory right to the land.

APPEAL from the District Court of the Eighth Judicial District, Esmeralda County.

The facts appear in the opinion.

*Ellis & King*, and *D. J. Lewis*, for Appellant.

I. The perpetual injunction must be dissolved. (*Thorne* v. *Sweeney*, 12 Nev. 251 and cases cited; 5 Cal. 119; 7 Johns. Ch. 334; 42 Eng. Ch. 165; 47 N. H. 437.)

II. This land is a part of the public domain, and Burbank had the right, under the act of congress of July 26, 1866 (sec. 2339 Rev. Stat. U. S.), to construct the ditch for agricultural purposes. At the time of the alleged tres-

pass, plaintiff was not in the actual, open and notorious possession of the land. (4 Nev. 66 and cases cited; *Sankey* v. *Noyes*, 1 Nev. 69; *Lechler* v. *Chapin*, 12 Nev. 65.)

III. The title was in dispute and the injunction should not have been granted. (High on Injunctions, secs. 257, 261–63.) The damage is alleged to have all been in the past, and none threatened in the future; for this reason the injunction ought not to have been granted. (High on Injunctions, secs. 4, 8 and 10; 4 Nev. 141; *Thorne* v. *Sweeney*, *supra.*)

*Robert M. Clarke*, for Respondent.

The several points discussed by counsel are stated in the opinion.

By the Court, LEONARD, J.:

This is an appeal from an order refusing to dissolve a temporary injunction—an order denying defendants' motion for a new trial, and from the judgment. The action was brought to recover eight hundred dollars damages for an alleged trespass in digging a ditch over and upon the land described in the complaint, and running water therein. Plaintiff also prayed the court to enjoin the defendants from digging said ditch, from conducting water therein, and from committing any further damages upon the land described. The defendants were enjoined until further order of the court. After due notice, defendants moved to dissolve the injunction upon the complaint and answer. That motion was denied, and plaintiff obtained a verdict in his favor for one hundred and fifty dollars damages, for which sum judgment was entered against defendants, besides seven hundred and twenty-six dollars and thirty-five cents costs, and defendants were enjoined "from the construction of any ditches, and from the running of any waters, over, through, or upon plaintiff's said land, and forever restrained and enjoined from further damaging said premises by the digging of ditches or the running of water as aforesaid."

In his complaint, plaintiff alleges these facts only: "That

since March, 1871, he has been, and still is, the owner, in possession and entitled to the possession of six hundred and forty acres of land described therein; that he has a family residence upon said land, in which he and his family reside; that he has cultivated a garden and grows grass and grain upon said land; that on the tenth day of April, 1877, without plaintiff's consent and against his will, defendant forcibly and unlawfully entered upon said land and cut a ditch one mile in length across the same for the purpose of conveying water; that by the cutting of said ditch and throwing the earth from it over a portion of said land, the latter has been rendered unfit for cultivation, plaintiff's property has been injuriously affected, and his use of it obstructed, by defendant's ditch, to plaintiff's damage in the sum of $800; that the damage being done to plaintiff's land by the digging of said ditch and the flowing of said water in and upon the land described, is irreparable; that plaintiff has been informed and believes, and so charges the facts to be, that defendants are insolvent and cannot respond to him in damages for any judgment he might obtain against them; that plaintiff is without any adequate remedy at law and is entirely remediless, without the equitable interposition of the court." No other facts are stated. Defendants deny all the material allegations of the complaint, and consequently all the equities, by a sworn answer. S. E. Burbank, one of the defendants, avers that on the second day of April, 1877, he became the owner in fee, conditional, of a large portion of the land described, and over which said ditch was constructed, by purchase from the government of the United States, under an "Act to provide for the sale of desert lands in certain states and territories," approved March 3, 1877, and that he is still the owner, in the possession, and entitled to the possession, of the lands so purchased.

Counsel for plaintiff admit that the averments of the complaint in support of the injunction are exceedingly defective; but they urge that, in the absence of a demurrer, they are sufficient after verdict and judgment for plaintiff, if the evidence sustains the judgment. Without deciding whether

counsel are or are not correct in their conclusions, as to the effect of the defective pleading, we shall assume, for the sake of the argument only, that they are correct, and shall examine the case in the light of the evidence, there being no substantial conflict as to the controlling facts. We pass the alleged error of the court in refusing to dissolve the temporary injunction, and shall consider the questions presented, from two standpoints.

1. Admitting, for the present, that plaintiff was entitled to a judgment for one hundred and fifty dollars damage, was he also entitled to an injunction?

2. Was he, from the evidence, entitled to any damages?

There are many reasons why the first question must be answered against the plaintiff, some of which will be stated. It by no means follows that the court would have been justified in enjoining defendants after verdict for plaintiff, even though the proof, had established the fact that plaintiff's legal rights in the land were superior to the rights of defendants. (*Wason* v. *Sanborn*, 45 N. H. 171; *Thorne* v. *Sweeney*, 12 Nev. 254.) The land in question at the time the final injunction was granted, was a portion of the unsurveyed public domain. Plaintiff has never taken any step to acquire title from the government. Under such circumstances there can be no doubt, that under the act of congress of July 26, 1866 (sec. 2339, U. S. Rev. Stats.), defendants had the right of way for the construction of their ditch over this land, subject only to the liability of paying for all damages or injuries done by them to plaintiff's possession. By that section the right of way for the construction of ditches and canals upon the public domain, for agricultural and other purposes named therein, is acknowledged and confirmed. There was no testimony showing or tending to show that in the construction of their ditch, or in conducting water therein, defendants interfered with, or injured, plaintiff's possession, unless he was in possession of the land itself. They did not injure any crops, fences or other improvements. The allegation of defendants' insolvency was fully denied by the answer, and there was no testimony tending to show that they were unable to respond in dam-

ages for any amount that might be recovered against them, in this or any subsequent action. Such being the case, we must presume that defendants were entirely solvent.

Upon this point, then, our case is this: Defendants are enjoined from doing, upon the public domain, what the paramount law declares they may do, when they are able to pay all damages done, or that may be done, to plaintiff's possession. It is a part of the act of congress organizing the territory of Nevada, that "no law shall be passed interfering with the primary disposal of the soil." The injunction in this case did, indirectly, so interfere. It deprived defendants of a right acknowledged and confirmed to them. The court could not do indirectly what the legislature was expressly prohibited from doing. Besides, the injury is not irreparable. Full compensation can be recovered in an action at law, if plaintiff has the superior title. Upon the question of damages plaintiff testified as follows: "In digging the ditch, defendants threw the earth out of it on the bank—the north bank. They also flowed water through it. With the ditch and the water, they have damaged me in a considerable sum of money. It is difficult to estimate the amount of damage. I think that, including what it would cost me to fill up the ditch, the damage is equal to the amount named in the complaint. Don't think I could fill it up for less than a thousand dollars. I consider it a continuing damage as long as the ditch is there. * * * The water in the Burbank ditch is a damage to my ranch, in addition to cutting it up and making it more difficult to farm. It will cause willows to grow along the bank of the ditch after a time. That has been the effect produced by the West Walker river ditch."

T. B. Smith, a witness for plaintiff, testified that "he thought the ditch was a damage to plaintiff's land; that if he owned the land he would not have the ditch run over it for considerable money." Defendants testified that they were in great need of the water; that they had no other source from which they could obtain water for irrigating their land; that if they were deprived of its use, their crops would be entirely and hopelessly destroyed, and that they would be damaged thereby several thousand dollars in one season.

The above is all the testimony upon the question of damage. The ditch was completed, and the water turned in and kept running, some time before the preliminary injunction even. At the time of the final injunction, the only act done, or to be done by defendants, was the running of water in a completed ditch, through an open, unoccupied, uncultivated portion of the public domain, used only for grazing purposes by plaintiff, and others who had no claim to it. If the digging of the ditch damaged plaintiff, such damage was complete before defendants were enjoined. The only possible future damage that could have been anticipated, was such as might result from keeping the ditch in repair, and running water therein, through an arid country that must be irrigated by artificial means before any kind of crop can be produced. There is no testimony that any injurious result will follow from the running of water in the ditch, except that it will cause willows to grow upon the banks. Whether such growth will be an injury, and if so, how much, or a benefit, does not appear. At any rate, admitting for the present purpose, that plaintiff's rights are superior to defendants'; it is apparent that his injury, on account of the running water, is but trifling in comparison with defendants' losses, if they are deprived of its use. The preliminary injunction should have been refused, because the complaint was insufficient to justify it; but having been granted, it should have been dissolved on defendants' motion, and a final injunction should have been denied after verdict for plaintiff. (*Thorne* v. *Sweeney*, 12 Nev. 254.)

We now come to the inquiry, whether upon the undisputed facts of the case, plaintiff was or was not entitled to recover damages in any sum. The answer first depends upon the result of another inquiry, to wit: At the time of the alleged trespass did plaintiff have such title or possession as entitled him to maintain this action for injury to the land itself? If he did not, the condition of defendants' title is a matter of no consequence.

As in ejectment, a rightful possession in the plaintiff is sufficient to enable him to maintain this action. (*Rogers* v. *Cooney*, 7 Nev. 217.)

In *Staininger* v. *Andrews*, 4 Nev. 66, this court said: "There seem to be but two methods in this state of acquiring title sufficient to maintain ejectment to public lands not surveyed or brought into market by the general government, and these are: First. By a compliance with requirements of 'An act prescribing the mode of maintaining and defending possessory actions for public lands in this state,' (Laws of 1864–65, 343); and, Second. By actual possession or occupation of such land." In pursuing our inquiry as to the plaintiff's rights we need not consider the effect of a compliance with the desert land law, because he claims no rights under that.

At the trial plaintiff offered, and the court admitted, in evidence, two certificates of survey, known as the Hall & Simpson survey, made April 29, 1864, and the Mitchell & Fuller survey, made on the preceding day, which covered the land occupied by defendants' ditch. They were made under the tenth and thirteenth sections of the statute of 1861, 267, entitled "An act to regulate surveyors and surveying," which sections were repealed March 9, 1865. (Stat. 1864–65, 344.)

The certificate to the Hall & Simpson survey was made June 10, 1864, but it was not recorded or filed for record until November 22, 1865. The certificate to the Mitchell & Fuller survey was made June 19, 1864, but was not recorded, so far as the record shows, until April 9, 1877; that is to say, the only proof before us that it was ever recorded, is a certificate of the county recorder, dated on the day last named, to the effect that a certain paper marked " Exhibit B" is a true and correct copy of the description and plat of the survey of land made for Mitchell & Fuller as appears of record   *   *   *   in his office.

Sections 10 and 13 of the statute of 1861, before referred to, read as follows:

"Sec. 10. Each county surveyor shall, within thirty days after completing any survey, make out a copy of the field notes and plat, and transmit one to the surveyor-general, and give a certificate of such survey to the person for whom it was made;   *   *   *   and such certificate, provided the

same shall be recorded in the county record within thirty days after the delivery of such certificate, shall be evidence of the title of possession to the person or persons holding the same.

"Sec. 13. Such survey so made, except in cases of mining claims, shall be evidence of possession for one year from the date of record of such survey."

The court instructed the jury as follows: " The presumption of the law is, that the plat of survey of Mitchell & Fuller's tract was filed within the time required by law, there being no evidence to the contrary."

It will be noticed that sections 10 and 13 were repealed before the Hall & Simpson survey was recorded, and there is no evidence showing that the Mitchell & Fuller survey was recorded before their repeal; also that the former was not recorded until long after the sixty days next succeeding the date of survey; and presuming the surveyor did his duty, that it was not recorded until long after the thirty days next succeeding the date of its delivery to Hall & Simpson. And to say the least, there is no proof that the Mitchell & Fuller survey was recorded within the time prescribed by the statute. Section 10 made the doing of certain acts, therein stated, evidence of possession, but the recording of the surveyor's certificate within thirty days from the date of its delivery, was made a condition precedent to its becoming such evidence. The burden of proof was upon plaintiff to show that they were recorded in time. The law may presume that the surveyor did his official duty and delivered his field notes, plat and certificate in time; but it does not presume in the absence of proof showing such facts, that either Hall & Simpson, or Mitchell & Fuller filed them for record, or that they were recorded, within thirty days after delivery to them.

The court also admitted in evidence a deed from Hall & Simpson to Frank Hall, and another from the latter to plaintiff, conveying the land described in the Hall & Simpson survey. These deeds were offered " for the purpose of showing title in the plaintiff from Hall & Simpson, through and under the survey offered, and to connect plaintiff with

said survey for the purpose of showing title under the same."
Both deeds were acknowledged before the Hall & Simpson
survey was recorded and long after the sixty days next suc-
ceeding the survey had expired. At the time the deeds
were acknowledged, as well as at the time of the trial, the
survey and the certificate thereto were not evidence of pos-
session under the statute, and consequently the deeds were
not admissible for the purposes stated. The deed from Mit-
chell to plaintiff, offered for the same purpose, was, for the
same reason, inadmissible for such purposes. Plaintiff
testified that until 1874 or 1875, there was but little of the
land in Smith's valley actually inclosed; that the farmers
of the valley herded the stock off of their land during the
growing and harvesting seasons; that they had an under-
standing to that effect, and that it was a custom among
them; that they also recognized and respected the bounda-
ries of each other's farm, regardless of the fact that they
were not inclosed, and regardless of the fact that such
boundaries were not particularly marked. The testimony
just stated was admitted against defendants' objection, and
the jury were instructed "that in determining the fact of
possession they were entitled to consider the character and
location of the land, the acts of the claimant, and the im-
provements made upon the land, and any well-known and
recognized custom at the time prevailing in Smith's valley,
and known to and acted on by the parties, as to the manner
of claiming and holding land by possessory title merely,
and as to the construction of fences and marking of bound-
aries of land."

They were further instructed that "if they believed from
the evidence that prior to 1875 it was a universal custom,
well known and recognized among the residents of Smith's
Valley, to claim and hold land by possessory right without
inclosure or fencing the same, and that defendants and
plaintiff knew of such custom and recognized it, and claimed
and held their lands under such custom; and that plaintiff
occupied and claimed the land in question under such cus-
tom; and that afterwards, and about that time, the residents
of said valley commenced to inclose and fence their lands:

and about that time, and before defendants made any claim to the land or ditch, the plaintiff commenced to inclose and fence the land in dispute, and since then has distinctly completed marking the boundaries of said land, and has partly inclosed said land, and has with reasonable diligence prosecuted the work of fencing and inclosing the same, then the jury must find for the plaintiff. In deciding the question of reasonable diligence, the jury are entitled to consider the situation and character of the land and the ability and means of plaintiff."

It was proper for the court to admit any testimony tending to show that it was unnecessary to inclose the land in question; as that, in accordance with a custom universally acquiesced in, stock was herded by the owners during the growing and harvesting seasons. (*Courtney* v. *Turner*, 12 Nev. 350.)

But testimony showing that the farmers of the valley recognized and respected the boundaries of each other's ranches, notwithstanding no boundaries were fixed or known, and although there were no inclosures, was inadmissible; and all instructions were erroneous which informed the jury that they might consider any well known and recognized custom known and acted on by the parties, as to the manner of claiming and holding land by possessory title.

Trespass is an action for injury to plaintiff's possession. The possession necessary as to public lands may be actual or constructive. If it be the former, in order to recover, he must show that he has performed such acts as are necessary in order to subject the land to his dominion and control—such acts as are essential to its beneficial enjoyment.

Constructive possession of such lands can be had only by a compliance with the possessory act of this state. An agreement or custom among the farmers of Smith's Valley prior to 1875, that they would respect the boundaries claimed by each, notwithstanding no boundaries were fixed or inclosures made, and that each might claim and hold by possessory title without taking the steps required by law, did not take the place of acts requisite in order to constitute constructive possession; nor did such agreement or custom excuse the failure to perform what was necessary under the

law to constitute such possession.   It was an effort to hold
public land by constructive possession, against the very
terms of the statute, which declares that "no person shall
be entitled to maintain any such action for possession of, or
injury to, any claim, unless he or she occupy the same, and
shall have complied with the provisions of the third and
fourth sections of this act."   (Stat. 1864–5, 343.)

Although plaintiff did not attempt to show a compliance
with the possessory act last referred to, he still urges that
his possession and title are ample to maintain this action
against defendants, for the following reasons:   1. Because
plaintiff resided upon the land, cultivated twenty acres in
alfalfa, and three acres as a garden; had a part actually in-
closed with a substantial fence—that is to say, the twenty-
three acres just mentioned, and held title of record to the
whole, which extends his possession to the limits of his
claim as defined by his deeds;   2. Because until 1874 the
land was claimed and held under a general custom univer-
sally prevailing and recognized in the neighborhood, and
after the custom ceased he proceeded with reasonable dili-
gence to inclose his land with a substantial fence;   3. Be-
cause the land was sufficiently inclosed, and the boundaries
marked, to create a possessory right.

We shall consider these three reasons in the order stated.
The first is not good for the reasons given in *Wolfskill* v.
*Malajowich,* 39 Cal. 280, and in *Eureka M. Co.* v. *Way,* 11
Nev. 182.

In answer to the second we shall add nothing to what has
been said as to the effect of the custom or agreement be-
tween the ranchmen.   But if it should be admitted, that
until 1874 or 1875, such custom supplied the place of actual
or constructive possession, still the testimony would not
show that subsequent to that date, plaintiff either subjected
the land over which the ditch was constructed to his domin-
ion and control, or that he proceeded with reasonable dili-
gence to do so.   Under this head we content ourselves with
the statement, that plaintiff did not have actual possession at
the time of the alleged trespass, and shall defer an examin-
ation of the testimony upon the point until we consider the
third reason above stated.   It is necessary, however, to

consider the claim that he proceeded with reasonable dili-
gence to subject the land to his control. It being true that
at the time of the alleged trespass, the land was not in the
actual or constructive possession of plaintiff, the burden of
proof was upon him to show that he had proceeded with
reasonable diligence in an effort to acquire such possession,
and in the absence of such proof, diligence cannot be pre-
sumed. Upon this point plaintiff testified as follows: "The
fence on the south and west sides of the Hall & Sampson
tract was sold by me soon after I bought it, in 1865;
soon afterwards the old house or cabin was also taken
down and hauled away in 1865; no buildings were ever
afterwards put upon the Hall & Simpson tract; the land
was never inclosed afterwards until about two years ago; I
then began to inclose the remaining portion of the two
tracts; * * * I hauled some posts and began to set
them for the purpose of making a wire fence; I dug the
post-holes along the south side of the ranch from the alfalfa
field to the south-west corner of the Hall & Simpson tract,
and from said corner northerly to a point intersecting Dobe
Smith's ranch; I set up some of the posts, but not all of
them; did not set any posts for a year or more prior to this
controversy; about the time when they were constructing the
ditch I was setting posts along the western boundary of my six
hundred and forty acres, to and across the course of the ditch;
* * * I have been fencing my land as fast as I could
for the past two years; I was not able to have any help,
and had to do the work myself; there were posts set up
on my west line north of where the defendants dug their
ditch. Some of the posts had been broken down since they
were set two years ago; those that had been broken down
or displaced had not been replaced; there was probably a
quarter of a mile on the west side, where the posts had not
been set up; the posts were on the ground; they were
hauled there two years ago and the post-holes dug; * * *
no crop of any kind had been cultivated on the Hall &
Simpson tract since 1865, and no crop had been grown
or harvested upon any of the land outside of the alfalfa
field and garden since 1871, except that I turned some water

out of my ditch on the land to make the wild grass grow upon it; I also sowed some timothy seed on the land among the sagebrush, so as to fit the land for grazing purposes; other people's cattle, as well as my own, grazed upon the land, when there were any in the valley; it was too much trouble, and would not pay, to herd them off; * * * there were several reasons why I did not cultivate the whole of the six hundred and forty acres; I did not have water enough; I was too poor to hire help to grub out the brush, inclose the land and put in crops; I found it necessary to hire out sometimes in order to make a living for myself and family; I have a wife and one child; * * in 1876 I farmed in Mason's valley, in this county; no one worked on my place except what my wife did; she resided on the place in Smith's valley during my absence, and worked the garden and attended to the alfalfa field."

T. B. Smith testified for plaintiff, that "the latter had lived on the Rivers ranch since 1870 or 1871; that he had been away part of the time working for wages; that he supposed he did not fence his ranch because he was too poor."

The above is all of the testimony of plaintiff, showing diligence, subsequent to the time the post-holes were dug, and a part of the posts set, two years or more prior to the alleged trespass.

Defendants' testimony accords with plaintiff's. They testified that "after the placing of the posts two or three years ago, Rivers did nothing more to reclaim the land outside of the field and garden, until this spring (1877), when he grubbed out the sagebrush from eight or ten acres next west of the field, and about seventy rods southerly from the ditch; the posts have never been connected by any boards, wires or anything else so as to make a fence. When we were digging the ditch, Rivers set up a few posts on the west side of the six hundred and forty acre tract—probably twenty in all."

We have stated all the testimony tending to show diligence; and in our opinion, instead of showing that he proceeded with reasonable industry to subject the land to his control, by the prosecution of such work as was necessary to

its complete enjoyment, it plainly shows an inexcusable want of diligent labor. True, plaintiff testified that he inclosed the land as rapidly as he was able; but he stated no single act, or effort of his in aid of such result, for a period of two years or more. He did not even keep the posts standing that had been set. He did not make an additional mark upon what he now claims as his boundary line, during that long period of time. At the trial he did not know where his boundaries were, except from the records of the surveys, and he admitted that when he set his posts he did not follow the lines of the surveys. In 1876 he left the land and cultivated another ranch in another valley. He went to California during the two years, and was absent about four months. It is said that he was poor and unable to inclose the land. If he was unable to to employ help, that fact would excuse him for not hiring, but it does not excuse him for not being diligent himself. If a man is poor, he should claim no more of the unsurveyed public domain than, within a reasonable time, he can subject to his dominion; then if he diligently pursues his work, the law will protect him, although, if ejected, he may not be able to show that he has secured an actual possession. (*Staininger* v. *Andrews*, 4 Nev. 70.)

We now come to the third reason stated above in support of the claim that plaintiff's possession was sufficient.

That an inclosure was necessary, subsequent to 1874, whether the land was used for agricultural or grazing purposes, is evident; and that in the absence of a proper fence, it was not subjected to the will and control of the plaintiff is equally certain. As we have seen from plaintiff's testimony, other people's cattle grazed upon the land whenever there were any in the valley; and there is no proof that the custom of herding off the stock has existed for two years or more. S. M. Burbank testified that " the land claimed by plaintiff, for the last ten or twelve years had been used as a common for grazing purposes, without any objection being interposed that he ever heard of," and his testimony was not disputed.

We do not deem it necessary to follow the witnesses in

their description of the boundaries marked, the posts set, etc. It was not claimed that there was an inclosure of any portion of the land upon which the ditch was dug. On the south side of the two tracts, posts, two rods apart, were set in 1874 or 1875. On the west side post-holes were dug the entire distance; post were set a part of the way, and were scattered upon the ground throughout the remaining portion of that side. On the west side many of the post-holes had been filled by gravel, and for a long distance north of the ditch there were few, if any, signs of a marked boundary of plaintiff's claim. From the north-east corner southerly there was a distance of forty rods with no boundary line, except a ditch belonging to defendants, while the next forty rods southerly had no boundary but a public road. Throughout the whole eighty rods just mentioned, there was not a post-hole, post or fence of any character.

T. B. Smith, a witness for plaintiff, testified that plaintiff had posts set up, and post-holes dug, and ditches, to mark the boundaries; that the lines could be easily distinguished by these marks. But upon cross-examination he stated that he did not know the boundaries; that he had been over it very little; never saw or looked for any monuments; had never been around the six hundred and forty acres, and could not say how far it was inclosed, except the field and garden; had seen a few posts at the west end; did not know how far the east end was marked by posts, monuments or fences other than the willow fence around the garden and field; that the land along the course of the ditch, though once cultivated, was then overgrown with sage-brush, grease-wood and rabbit-brush, and bore a strong resemblance to the outside lands; that the brush was not quite as large, though much of it was two feet high.

In my opinion the testimony would not have justified a verdict for plaintiff had the ground been timber-land and the action been trespass for cutting and carrying away timber therefrom. (*Eureka M. Co.* v. *Way,* 11 Nev. 174.) In such a case, it is established that an occupation within boundaries so clearly marked and defined as to notify strangers that the land is taken up or located is all that is

necessary. (*McFarland* v. *Culbertson,* 2 Nev. 282; *Eureka M.
Co.* v. *Way, supra.*) In the last case the court says: "With-
out here entering into the details of the testimony, it may be
stated in general terms that for more than a quarter of a
mile on the south line between the bluff of rocks and the
summit of the mountain, there are no blazed trees to desig-
nate the boundary, and for a distance of one thousand two
hundred and sixty feet from the south-west corner, along
the western line, over a smooth, grassy plot, there is no
monument, tree or anything else to mark the line. (p. 175.)
* * * That natural boundaries, when taken in connec-
tion with artificial, are sufficient to mark the boundaries of
timber-land, will not be disputed; but the artificial bound-
aries must be made in such a manner as to clearly mark and
define the line, and must connect with the natural bound-
aries in such a way that any person going upon the land
could, by following the marked lines, tell the precise extent
of the land located and claimed, and the claimant must be
an actual occupant within such boundaries." (p. 182.) And
on page 176 it is said: "In the absence of a perfect in-
closure, it is certainly essential that the boundary lines
should be so clearly marked and defined that the same
could be readily traced, and the extent of the claim easily
known, and no stretch of the imagination could be so ex-
tended as to authorize any court to hold that the boundary
lines were so marked and defined around the land in ques-
tion. How could a stranger crossing the smooth, grassy
spot designate the boundary? There is no fence, no string
of brush or felled trees, no mark or monument for a distance
of a quarter of a mile. Almost the same condition of the
boundary is found on the south line, between the bluff of
rocks and the south-west corner. A stranger in entering
would discover no visible signs of any designation of
boundaries whatever. The law does not require speculation
upon these points. The acts necessary to clearly mark the
boundaries must be done in order to notify strangers that
the land is located. Otherwise any person would have as
much right as the claimant to enter upon the land, cut the
wood and timber thereon and take the same away."

But the land in this case is not timber land, and requires more than a marking of the boundaries before it can be said to be subjected to the dominion of plaintiff. For a period of two years prior to the alleged trespass, it could have been put to no exclusive, valuable use by plaintiff without inclosing it. It is not pretended that he did have its exclusive use for any purpose. It follows that plaintiff did not have possession of the land over which defendants dug their ditch, and consequently that he was not entitled to recover damages in any sum.

The injunction is dissolved, and the judgment and orders appealed from are reversed.