By the Court,
Beatty, J.:
This is an action for the recovery of a tract of land. At the close of the trial in the district court the defendants moved for a nonsuit, which motion being overruled, they declined to offer any testimony on their part and the plaintiffs had judgment. Several exceptions to the rulings of the district judge appear in the record, but the only point made in argument by counsel for appellants is, that the testimony for the plaintiffs was insufficient to show any right of possession in them to the demanded premises.
A number of witnesses were examined, whose testimony established the following facts: The land in controversy is situated in Fish Lake valley, in Esmeralda county, a region totally devoid of timber. In the lowest part of the valley there is a narrow strip of meadow land, less than half a mile in width, extending several miles in length, north and south, and bordered on either side by barren sagebrush plains and rocky hills. In its natural state, this meadow land was wet and swampy and unfit for the production of hay. In February, 1865, Moore, Wilds and Dorr caused a survey to be made of a rectangular tract of land a mile long and half a mile wide, embracing a mile in length of this boggy meadow. They had the survey recorded, in attempted compliance with the possessory act (C. L. secs. 78-85), but failed to make the requisite affidavits, and it is conceded that they can claim nothing b}' reason of their partial compliance with the provisions of that law.
The question is, whether they and their successors reduced the land to their actual possession. The testimony *351 shows that after the survey Dorr had nothing more to do with the land. He seems to have abandoned his interest. Moore and Wilds, however, erected a house within the lines of the survey, on the meadow land; near the south end of the tract and resided there until, in 1871, they conveyed to A. Powell and L. B. Powell. The Powells then took up their residence on the land. At the end of a year L. B. Powell went to Canada, where he was residing at the date of the trial, September, 1876. A. Powell, however, continued to reside on the land, holding it for his brother and himself. In January, 1876, he conveyed his interest in the land, an undivided half, to J. B. and E. C. Courtney, who, with L. B. Powell, are the plaintiffs in this action. During the eleven years between February, 1865, and January, 1876, Moore and Wilds, first, and the Powells afterward, continuously resided in the house on the south end of the tract. They constructed a large ditch from one end of it to the other, near the west line of the survey, with which they connected lateral ditches, by means of which the land was thoroughly drained. They found the land too uneven for the operation of a mowing machine, and they leveled it by cutting down the hummucks and filling up the low places. There were some spots too dry to be productive, and they irrigated those through artificial channels. By expending labor on the land to the value of three or four thousand dollars they reclaimed it and made it valuable. From a miry bog, from which the hay could not be gathered, they converted it by their labor into a level meadow, producing an annual crop of two hundred and fifty tons of good hay; and every year they cut and harvested the crop.
In the fall of 1875, in addition to the house originally built by Moore and Wilds on the south end of the tract, and in which A. Powell was residing, there was an unfinished stone cabin standing about the middle of the north half of the tract. Bickey, one of the defendants, Avho Avas mining or prospecting in the neighborhood, obtained permission from PoAvell to occupy this cabin, and PoAA'ell furnished a team and Avagon and the services of one of his hired men to assist Bickey to pub a roof on the cabin and *352 make it habitable. Under these circumstances Rickey went upon the land. He occupied the cabin for a short time together -with Turner, his co-defendant, and then gave it up to the Courtneys, who also sought and obtained Powell’s permission to live there during his pleasure. After the Courtneys moved into the cabin the defendants lived in a tent near by and boarded with the Courtneys, who were working for Powell, baling hay. About this time Turner and Rickey conceived the idea of “jumping” the north half of Powell’s land — the half upon which they were residing by his permission. They had heard that L. B. Powell was an alien and was absent from the country; the land was not fenced and there were no stakes or ditches defining the boundary lines; they thought the tract was larger than A. Powell alone had any right to hold, and for these reasons they proposed to the Courtneys to go in wi th them and ‘ ‘ j ump ” the north one hundred and sixty acres. This proposition was rejected, the Courtneys preferring to purchase from the Powells. This they did, giving A. Powell' three thousand dollars for his interest and agreeing to give the like amount for the interest of L. B. Powell when his deed could be obtained.
About this time the Courtneys removed to the house on the south end or half of the tract, in order more conveniently to carry on their work of baling hay. They left a man in charge of the cabin, however, and left some of their household furniture, including a cooking-stove. Shortly afterwards, Turner and Rickey, who had been off prospecting or mining, returned, took possession of the cabin, surveyed the north half of the tract, planted stakes at the corners and have since, until ejected under the judgment in this case, excluded the plaintiffs from the possession thereof. The appellants contend that they had a right to take possession of the north half of the tract because it was never fenced and its boundaries never distinctly marked, and they claimed that these things were essential to an actual pedis possessio of this chai-acter of land.
The respondents answer that fencing was wholly unnecessary to the enjoyment of the land, and would have been a *353 useless expense. This position is fully borne out by the testimony. It was shown that the region of Fish Lake valley was entirely destitute of fencing material; that the valley is isolated in situation and is occupied by a small community of farmers who have established the custom — universally acquiesced in — of driving all live stock out of the valley during the cropping season — that being the cheapest and most effective means of protecting their crops.
As to the marking of boundaries, the testimony showed that Moore and Wilds planted small stakes in mounds of earth, or rocks, at three corners of their survey. These were, of course, wholly insufficient to mark the boundaries so as to advise a stranger of the extent of the claim. But the end lines on the north and south, dividing the Moore and Wilds claim from the claims of subsequent settlers who occupied and improved the meadow lands above and below them, were well known and recognized and respected by the contiguous owners. So far as the neighborhood was concerned, they were notorious, and they were marked, one by two stakes and the other by one. The east and west lines of the survey were longer and, from that circumstance, less defined than the north and south lines. But the east and west lines of the meadow land were clearly defined by the waste, rocky and barren land by which it wa.s bordered. From all the evidence in the case, which is voluminous on these points, it is plain that no man could have gone on these premises and seen the houses, the ditches, the improvements of every kind, and failed to see that all the meadow land for miles in extent was occupied, cultivated and improved. The judgment in this case, it is true, conforms to the survey, and therefore embraces narrow strips of waste land on the east and west sides of the meadow, which were never occupied or improved by either the plaintiffs or defendants. The extent of this waste land included in the judgment is, however, inconsiderable, and it is of no value. No point was made in the court below and none is made here upon the error of the court in including this land. The whole contention is as to whether the plaintiffs had possession of the meadow land; such a possession *354 as would support an action against an intruder. We think that there is no doubt that they had.
It has never been decided in this state or, we believe, in California, that a substantial inclosure is essential, under all circumstances to the actual possession of agricultural land.
It was said in Sankey v. Noyes, 1 Nev. 71, “What acts are sufficient to constitute such a possession of public land as will maintain ejectment has long been a vexed question in the courts of California, and our own courts have found it impossible to announce any general rules that would meet the varying circumstances of every case. But it seems to be generally agreed that these acts must, in a great measure depend upon the character of the land, the locality, and the object for which it is taken up. While arable or meadow land should be inclosed with a substantial fence, cultivated and improved, land¡ which is only valuable for the timber upon it might be held by a much less substantial inclosure, and cultivation or improvement would not be necessary.”
Great reliance is placed by the appellants upon this passage, in the opinion in Sankey v. Noyes, as establishing the rule that meadow land must be fenced, in order to reduce it to possession. But even if this language had not been materially qualified by later decisions of this court, it has only to be read in connection with its context to see that the intention of the court was merely to announce a general — not an invariable — rule, illustrative of the principle upon which it is founded. The principle underlying all the definitions of actual possession is this: Actual possession of land consists in subjecting it to the will and dominion of the occupant, and must be evidenced by those things which are essential to its beneficial use. Justice to the community also requires in the circumstances of this country, that the extent of the claim should be clearly defined, and that the possession should be open, notorious and continuous. These were the reasons for the rule announced, that arable or meadow land must be substantially inclosed, and where these reasons fail the rule would not be applied. The reasoning of the same court, speaking by the same judge, in McFarland *355 v. Culbertson, 2 Nev. 282, bears me out in this position: “The courts of this state have uniformly held that a perfect inclosure of timber land is not necessary. To build a fence that would turn stock would be a perfectly useless act, and one which the courts have never required. If there be an occupation within boundaries so clearly marked and defined as to notify strangers that the land is taken up or located, it is all the possession which the courts of this state have ever deemed necessary to require.” The court then proceeded to give the reasons for this — reasons that must always control courts in the application of the rule: “The timber land in this state is usually of no value except for the wood and timber which may be taken from it; no fence would be necessary to subject it to the complete control of a person locating it for that purpose. The land would be as useful without being inclosed by a fence as if it Avere, Avhilst arable or farming lands would not. Usually, arable or meadoAV land can only be subjected to the purposes for Avhich it is most useful by such an inclosure as will turn stock. Hence, the courts have repeatedly held that such lands must be inclosed by a substantial fence; but as the laAv never requires a vain thing to be done, the courts require nothing more than a distinct marking of the boundaries of timber land and an actual occupation within those boAindaries.”
Here the reason for requiring the fencing of meadoAV land is clearly stated: It is because otherwise it could not be subjected to the purposes for which it is most useful. The implication is equally plain that where the circumstances of a country are such that the fencing of meadow land is not necessary to its beneficial use and would be ruinously expensive; Avhere it Avould be against the interest of the occupants and of the public to require it; where other means as effectual for the protection of the growing crops are provided by the occupants of the land, they would not be obliged to incur the useless expense of fencing. “Actual possession of land is the purpose to enjoy, united with or manifested by such visible acts, improvements or inclosures as will give to the locator the absolute and exclusive enjoyment of it.” *356 (Staininger v. Andrews, 4 Nev. 68; Coryell v. Cain, 16 Cal. 573.)
A general discussion of these questions in English v. Johnson (17 Cal. 117), is closed by this pertinent inquiry: “If there were no timber or other means of fencing, and no necessity or use for fences in a large district, could there be any sense in holding such acts necessary to protect a possession from intrusion?” But the point under consideration has been expressly decided by this court in a late case: “From the testimony it clearly appears that the plaintiff cultivated at least one hundred and twenty-five acres on his two ranches. There is no testimony showing that it Avas necessary to inclose the land in order to cultivate it. The plaintiff must be considered as in possession of all the land actually under cultivation.” (Barnes v. Sabron, 10 Nev. 240.) The same principle is recognized in Eureka Co. v. Way (11 Nev. 182).
It is clear that under the circumstances of this case, the plaintiffs were not required to fence their land in order to hold it. But it Avas due to the public that the extent of their claim should be so clearly defined as to notify neAv coiners. Appellants contend that for this purpose the lines of the survey should have been marked by stakes, ditches or some similar means. These are the means usually employed for defining the boundaries of a possessory claim, but they are not exclusive of other means equally efficacious. It is a question of fact Avhether in any given case the limits of a claim are sufficiently defined to advertise the public of their extent, and in this case there can be no doubt under the testimony, taking it as true, that any stranger would have known that all the meadow land in controversy Avas occupied and claimed before the defendants entered upon it. It had been reclaimed from its natural and unproductive state, it had been drained, leveled, .irrigated and continuously occupied and cultivated for eleven years by the plaintiffs and their grantors. The defendants entered upon it by their permission, and Avhat everybody else might have known they certainly did know. ' They knew the meadow lands were cultivated and improved to the edge of the barren *357 laud on the east and west, and for miles in extent north and south. As to the lines between the contiguous occupants, the appellants might have had no sufficient means of tracing them, but they could not help knowing that all the meadow land between the different houses was occupied.' If the plaintiffs and their next neighbors on the north and south had no trouble about their dividing lines, the fact that they were not conspicuously marked does not help the case of the defendants. '
As to the alleged alienage of L. B. Powell, it is not clear that he is an alien, but if it were, it would make no difference in this case. An alien will be protected in the posession of the public lands the same as a citizen. Neither can hold as against the government title, but the defendants have not shown, or offered to show, that they have the government title, or that they have taken any steps to obtain it. They are mere naked trespassers upon the possession of one wdio, so far as the proof goes, has as much right as they have to occupy any portion of the public lands.
The judgment of thd district court and its order overruling defendants’ motion for a new trial are affirmed.