## GORDON v. ROSS-HIGGINS CO. et al.

### (Circuit Court of Appeals, Ninth Circuit.   June 1, 1908.)

### No. 1,440.

PUBLIC LANDS—TOWN SITE LAW—OCCUPATION OF LOT—ABANDONMENT.

Plaintiff staked out a lot in the mining camp of Fairbanks, Alaska, and built a log cabin thereon in which he resided for some three months and then left and did not return for three years. He left some tools, a stove, etc., in the cabin, and asked two different persons to look after the property for him, but neither took possession of nor occupied the same. No steps had been taken to locate a town site at Fairbanks, and there was no law under which titles were recorded, but books were kept for the benefit of settlers in which locations were recorded, and plaintiff's was recorded therein. About a year after he left, other persons located the lot and went into possession, which was continuous thereafter; their rights having been subsequently acquired in good faith by defendants, who with their grantors had made valuable improvements on the property. *Held*, that plaintiff's acts amounted to an abandonment of the lot, and that he was not an occupant or in possession and had no right therein which could ripen into a title under the town site law at the time of its location by defendant's predecessor in interest, or which would support an action to recover the property from them.

In Error to the District Court of the United States for the Third Division of the Territory of Alaska.

This is an action in ejectment brought by the plaintiff in error against the defendants in error to recover possession of lot No. 2, in block 3, in the town of Fairbanks in the territory of Alaska, and for the value of the rents and profits of the lands and premises while the plaintiff was excluded therefrom.

The plaintiff alleges in his complaint: That on the 1st day of June, 1906, he was the owner and seised and possessed and entitled to the possession of the lot in controversy; that he had been such owner ever since the 24th day of February, 1903; that on or about the 15th day of June, 1906, the defendant the Ross-Higgins Company entered upon the northerly portion of said lot, 50x100 feet in size, and ever since has forcibly retained possession of the same; that on or about September 24, 1904, the defendant Lillie J. Ray entered upon the southerly portion of said lot, 50x65 feet in size, and ever since has occupied and retained the use and possession thereof.

The defendants in their answer deny the allegations of plaintiff's complaint, and for a further answer aver that the defendant Ross-Higgins Company is the owner (subject to the paramount title of the United States) and in possession of and entitled to the possession of the lot of land described in the complaint. For a further defense the defendant Ross-Higgins Company alleges: That on the 13th day of June, 1906, it found one Daniel McLean and John McLeod, by their lessee, a tenant, in the quiet and peaceable and exclusive possession of the lot of land in controversy, claiming to own and possess the same as a town lot located on the public lands of the United States; that the said McLean and McLeod and their grantees and predecessors in interest had held and possessed and occupied the said lot of land for more than three years; that on the 13th day of June, 1906, the defendant, in good faith, purchased from said Daniel McLean and John McLeod a portion of said lot and the improvements thereon and received from them a deed therefor and the quiet and peaceable possession of the premises: that defendant, at the time of said purchase, was ignorant of any claim of plaintiff to said lot; that it caused due and diligent inquiry to be made to ascertain if any person other than the said McLean and McLeod had or made any claim to said premises; that before the commencement of this action the defendant, in good faith, and at an expense of more than $2,500, built and constructed upon said premises a large frame store building and other buildings to be used in con·

nection therewith; that plaintiff never did at any time, until long subsequent to the erection and completion of said building, notify defendant of his claim to said property. For a further defense, defendant alleges that, more than three years prior to the time when the defendant so purchased the said lot from Daniel McLean and John McLeod, plaintiff had abandoned any claim theretofore had or made to said lot or any part thereof. For a further answer it is alleged that Lillie J. Ray is, and ever since the 24th day of September, 1904, has been, the owner (subject only to the paramount title of the United States) and in the possession and entitled to the possession of the said 65 feet more or less of the lot in controversy. Plaintiff in his reply denies the affirmative matter contained in defendant's answer, and, replying more specifically, that he ever abandoned the lot in controversy. The case was tried before the court and a jury.

The plaintiff testified in his own behalf substantially to the effect that he staked the lot in controversy on the 24th day of February, 1903, by placing stakes on it in the usual way, and that he filed a notice to be recorded with a person who was acting as recorder for the settlement of Fairbanks. After he staked the lot he built a cabin on the lot, on the Second avenue end of the lot. The cabin was 12x14 or 12x16 feet. The cabin was built out of logs. The logs were cut down on the premises, rolled together, notched and erected, and moss put between the logs and on the roof of the cabin, after putting the roof on. Then lined the cabin with canvas; the canvas coming down to between two and three feet from the floor. There was a door in the cabin, but he could not get any windows at the time, and the cabin had no windows. The openings were closed with a piece of canvas. The cabin was partially floored. There was a bunk in it and a stove, and he placed his tools in the cabin, carpenter's, machinist's, and steam-fitting tools. He had two pairs of blankets and his clothes there. He lived in the cabin after that time until about the 25th of June. He left there about the 25th day of June. He was looking for work at the time. Left the cabin fastened up and in charge of two different parties. The first one was Antone Mainville. The witness was looking around for something to do in Fairbanks. Mainville said he might have to go away soon himself. The witness was going out to the Creeks at that time looking for work. Then he spoke to Marston about it. Plaintiff went out to the Creeks, to Cleary and Gold Stream. He was there two or three weeks; stopped with a party who was doing some prospecting. Followed Gold Stream down that way. Went to a place called Nulato. From there he went to St. Michaels and remained eight or ten days. His health was poor. Had a bad cough. Thought he had the consumption. From there he went to Seattle, where he remained six or eight weeks; from there to the Hawaiian Islands. Went there because he was sick. Remained a year and a half. Received a letter from Marston, who stated that all his tools had been stolen out of his cabin, and a party had come along and staked the ground. Was not in a position to do anything about it. Was in poor health. He returned to Seattle in 1905, and from Seattle proceeded to Valdez, where he remained four or five months, working part of the time, then returned to Seattle, where he remained until the next spring, and then returned to Fairbanks in 1906 and undertook to take possession of his cabin. He found the cabin open and no window in it. The canvas he had put in the cabin was not there. No property of any kind in the cabin. He found Ross-Higgins Company on the First street end of the property and Mrs. Ray on the Second street end. On the 6th day of July, 1906, he commenced the present action against the defendant.

He was asked by his counsel whether or not at the time he left Fairbanks to go to the Creeks, or when he left to go to the outside, or at any time, he ever intended to abandon his property, to leave it and make no further claim to it. To this question he answered "No," and further stated, in answer to a question, that he never authorized anybody to part with the property on his behalf. After some further testimony concerning the cabin, the plaintiff rested, whereupon defendant moved the court for a nonsuit, on the ground that the plaintiff had failed to show such a prior possession of the property in controversy at the time of the commencement of the action as entitled him to maintain an action of ejectment; that the testimony on behalf of the

plaintiff showed only that he was in possession of the property for a period of about three months in the year 1903; that he left the property at that time and was continuously absent from the 25th day of June, 1903, until the 1st day of July, 1906; that he had offered no proof whatsoever that he had any one else in possession of the property for him and on his behalf during that time, or that he had left anything upon the property to indicate to the defendants in this action that he claimed any interest; and, furthermore, from the length of the absence of the plaintiff from the property, the law conclusively presumed an abandonment. The court declined to rule upon the motion at that time, and the defendants proceeded with their testimony. In plaintiff's testimony a book was introduced in evidence purporting to be a record book of lot locations kept by the persons acting for the settlers of Fairbanks. There appeared to have been no authority of law at that time for a town recorder of Fairbanks whose duty it was to keep any record of town lots. This record was therefore not admitted as binding upon any one as a notice of title, but was admitted as simply showing possession. In this book was recorded: "Block 3 East, between First and Second streets, lot 2, February 24, 1903, William Gordon, March 3, 1903, Recorded." Underneath this record was the notice of the subsequent location of the same lot, namely, the joint location of the lot by Limbocker and Smith. The defendant's testimony showed a chain of title by recorded deeds and possession, commencing with Limbocker and Smith, in July, 1901, and by various conveyances the title to 50 feet on First avenue by 100 feet in depth became vested in the defendant Ross-Higgins Company, and the title to 50 feet on Second avenue and extending north toward First avenue, a distance of 65 feet more or less, became vested in the defendant Lillie J. Ray. It appears from the testimony that the representative or agent of the defendant Ross-Higgins Company, on June 13, 1906, purchased the northern portion of the lot in good faith from Daniel McLean and John McLeod, who appeared to have the record title to the ground, and paid them therefor the sum of $1,200; that on September 24, 1904, Henry T. Ray purchased the southerly end of the lot in good faith from Charles Irwin and Helen B. Irwin, who appeared to have the record title to the ground, and paid them therefor the sum of $625, taking the deed in the name of Lillie J. Ray.

The plaintiff was then permitted to call as a witness A. L. Mainville, who testified that when the plaintiff left Fairbanks in the summer of 1903 he told the witness to look after the lot in question when he was gone. The witness himself left Fairbanks on the 13th of July, 1903. The plaintiff also called Edward Marston, who testified that he was living in Fairbanks in 1903; that he was keeping the Fairbanks saloon and hotel. The plaintiff came to witness and asked him if he would look after his property, as he was going away to look for work, and perhaps going to the outside, and the witness told plaintiff he would do the best he could. The witness further testified that in July, 1904, Limbocker came to the witness and said he wanted to use the tools in the cabin. The witness said he had no right to loan them. Subsequently Limbocker acknowledged he had borrowed them. The witness said he did not do anything further about the matter. He had no power of attorney to act.

At the conclusion of the evidence, the attorney for the defendants renewed his motion that the court instruct the jury to return a verdict in the case in favor of the defendants, for the reason assigned in the motion for nonsuit, and for the further reason that it was undisputed that the defendants in the case had no notice or knowledge of any claim of the plaintiff in the case to the property, and that the premises were abandoned by the plaintiff in this case. The court instructed the jury accordingly, and the plaintiff excepted. The jury returned a verdict for the defendants. From the judgment entered upon the verdict the case is brought here upon a writ of error.

Claypool, Kellum & Cowles (W. C. Sharpstein, of counsel), for plaintiff.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The errors assigned relate to the rulings of the court in the exclusion and admission of evidence and the action of the court instructing the jury to find a verdict for the defendant. In our view of the case it will be sufficient to determine the question whether upon the evidence the court was justified in instructing the jury to find a verdict for the defendant.

Section 2387 of the Revised Statutes (U. S. Comp. St. 1901, p. 1457), provides that:

"Whenever any portion of the public lands have been or may be settled upon and occupied as a town-site," it shall be lawful to enter "the land so settled and occupied in trust for the several use and benefit of the occupants thereof, according to their respective interests."

The act entitled "An act to repeal timber-culture laws, and for other purposes," approved March 3, 1891 (26 Stat. 1095, c. 561 [U. S. Comp. St. 1901, p. 1536]), provides, in section 11:

"That until otherwise ordered by Congress, lands in Alaska may be entered for town-site purposes for the several use and benefit of the occupants of such town-sites, by such trustee or trustees as may be named by the Secretary of the Interior for that purpose."

It does not appear that at any time during the period involved in the question of the possession of the lot in controversy any proceedings were taken under the statute by the town of Fairbanks to execute the trust therein provided; but the possession here contended for by the parties to this action is one that may ultimately ripen into a title under such statutes (Malony v. Adsit, 175 U. S. 281, 289, 20 Sup. Ct. 115, 44 L. Ed. 163), and the court must determine the character of occupancy or possession with that purpose in view. In Bender v. Shimer, 19 L. D. 363, 367, the Secretary of the Interior, in a contest relating to a lot in the town of El Reno in Oklahoma, had occasion to consider the question:

"What is the meaning of the word 'occupancy' as a term of real estate law, and who is an 'occupant' within the meaning of the town site law?"

The Secretary, in discussing this question, says:

"The meaning of the term may differ very materially, it seems, in its application to different kinds of property, according to the use which, from the nature of it, it is commonly designed. 'Occupied' always implies a substantial and practical use of a building for the purpose for which it is designed. In insurance law, the terms of a policy contemplate that a dwelling house is occupied when human beings habitually reside in it, and unoccupied when no one lives or dwells in it; that there be in the house the presence of human beings, as at their customary place of abode, not absolutely and uninterruptedly continuous, but the house must be the 'place of usual return and habitual stoppage.' Within the meaning of a tax law, the owner of land may be in occupation of it by his tenant. See Anderson's Law Dictionary, p. 725, title 'Occupy,' and cases therein cited. An occupant, within the meaning of the town site law, is one who is a settler or resident of the town and in bona fide actual possession of the lot at the time the entry was made. One who has never been in actual possession of a lot cannot therefore be said to be an occupant of it. The occupancy must be actual and cannot be begun by an agent. It must be for residence or for business, or use, and the residence, business, or use must be by the claimants. There must be a subjection of the land to his will and control. See American & English Encyclopedia of Law, title "Town-

sites,' note 'Occupant,' vol. 19, p. 364, and cases therein cited. The authorities, however, are uniform that actual settlement is not required to constitute actual possession. 'Actual possession as much consists of a present power and right of dominion as an actual corporeal presence.' Minturn v. Burr, 16 Cal. 107–109. By 'actual possession' is meant a subjection to the will and dominion of the claimant, and is usually evidenced by occupation, by a substantial inclosure, by cultivation, or by appropriate use, according to the particular locality and quality of the property. Coryell v. Cain, 16 Cal. 567–573. 'Actual possession' of land is the purpose to enjoy, united with, or manifested by, such visible acts, improvements, or inclosures as will give to the locator the absolute and exclusive enjoyment of it. Staininger v. Andrews, 4 Nev. 59–631. It is 'actual' also where one having the title is in possession of lands by his tenant, agent, or steward. Fleming v. Maddox, 30 Iowa, 240. It follows from these authorities that there can be no such thing as constructive occupancy under the town site laws, but there must be an actual bodily presence of the claimant, or some one for him, on the lot or lots for which he seeks to acquire title, or a purpose to enjoy, united with, or manifested by, such visible acts, improvements, or inclosures as will give to the claimant the absolute and exclusive enjoyment of it."

In Courtney v. Turner, 12 Nev. 345, 352, the Supreme Court of Nevada, in considering what acts were sufficient to constitute such a possession of public lands as would support an action of ejectment, said:

"'Actual possession' of land consists in subjecting it to the will and dominion of the occupant, and must be evidenced by those things which are essential to its beneficial use. Justice to the community also requires in the circumstances of this country that the extent of the claim should be clearly defined, and that the possession should be open, notorious, and continuous."

Applying these definitions of "occupancy" and "possession" to the facts of the present case, we find that the plaintiff was not an occupant or in possession of the lot in question when the defendants' predecessors in interest entered upon and took possession of the premises. The plaintiff testified that he occupied the cabin from the time he completed it until about the 25th day of June, 1903. He was asked by his attorney: "When did you leave that property?" His reply was: "I left there about the 25th day of June, somewhere around there." What did he mean when he said he left the property in June, 1903? He meant that he did not continue in actual possession of it after that date. He was not in the actual possession of the lot himself after June 25, 1903, and he did not have a tenant or agent in actual possession for him after that date. Mainville testified that the plaintiff told him to look after the lot when he was gone, but Mainville did not live in the cabin, and was not left in actual occupation or possession of the lot, and, besides, he remained only a few days in Fairbanks. Marston was next asked to look after the property. He was keeping a saloon and hotel, did not occupy the cabin, and was not left in the actual possession of the lot.

Leaving tools in the cabin, together with a stove and a few articles of personal property, was not of itself sufficient to retain possession of the premises; nor was the claim made by the plaintiff that he was in poor health a sufficient excuse for his failure to maintain possession of the premises for the period of three years. His poor health did not prevent him from having a representative on the premises.

162 F.—41

He knew in 1904, while he was in the Hawaiian Islands, that his tools had been taken from the cabin, and that another party had taken possession of the ground; but he took no steps to assert his claim of possession. He was at Valdez, in Alaska, four or five months during the summer of 1905, and still he made no effort to protect whatever right of possession he may have had at that time. He waited until other parties had placed expensive improvements upon the ground before he took action. This does not look like good faith in dealing with the claim of a right of possession on public lands, particularly in a mining camp. Such conduct amounted to an abandonment of the ground in controversy. It is true that he testified in October, 1906, that he never intended to abandon the property; but this declaration cannot, under the circumstances, prevail as against the evidence afforded by his acts.

In this view of the case the remaining assignments became immaterial and need not be considered.

The judgment of the District Court is affirmed.